IN THE COMMONWEALTH COURT OF PENNSYLVANIA

POM of Pennsylvania, LLC,        :
            Petitioner      :
                            :    No. 418 M.D. 2018
                            :
           v.               :
                            :    Argued: May 8, 2019
Commonwealth of Pennsylvania,     :
Department of Revenue, and City      :
of Philadelphia,                   :
            Respondents    :


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
                  HONORABLE RENÉE COHN JUBELIRER, Judge
                  HONORABLE ROBERT SIMPSON, Judge[1]
                  HONORABLE PATRICIA A. McCULLOUGH, Judge
                  HONORABLE ANNE E. COVEY, Judge
                  HONORABLE MICHAEL H. WOJCIK, Judge
                  HONORABLE CHRISTINE FIZZANO CANNON, Judge


OPINION BY
JUDGE McCULLOUGH                      FILED: November 20, 2019


Before this Court is the Commonwealth of Pennsylvania, Department of Revenue's (Department) application for summary relief in the nature of a motion for partial judgment on the pleadings with respect to the Department's counterclaim to the petition for review in the nature of a complaint seeking a declaratory judgment and injunctive relief, filed in this Court's original jurisdiction by POM of Pennsylvania, LLC (POM). For the reasons set forth, we deny the Department's application for summary relief.

---

[1] This matter was assigned to this panel before September 1, 2019, when Judge Simpson assumed the status of senior judge.

# I. Procedural History

On June 8, 2018, POM filed a petition for review in this Court's original jurisdiction seeking a declaratory judgment and injunctive relief, naming as respondents the Department and the City of Philadelphia (City). According to POM's petition for review, POM "distributes software for a skill-based video game machine, called the Pennsylvania Skill$^{TM}$ Amusement Device 402.49 PEN" (POM Game) throughout Pennsylvania. (Petition ¶1.) The POM Game is primarily located in taverns, restaurants, and social clubs that serve alcohol under license from the Pennsylvania Liquor Control Board. (Petition ¶12.) The POM Game is a coin-operated video machine that offers several games including a tic-tac-toe style puzzle, a potentially unlockable bonus session, and a "Follow Me$^{TM}$ colored dot-matching second phase of game play." (Petition ¶¶13-14.) If a player is ultimately successful playing the POM Game he or she is awarded with a combined total of 105% of the original amount spent to play. (Petition ¶28.) POM asserts that the POM Game is not an illegal gambling device under Pennsylvania criminal law, but rather, that it is a legal game of skill. (Petition ¶29.)

POM avers that from March 2017 until June 2018, the City conducted 11 separate seizures of the POM Game and arrested employees and seized funds at each location. (Petition ¶30.) POM alleges that the City's illegal seizures of the POM Games have interfered with the Department's mission to fairly, efficiently, and accurately administer the tax laws and other revenue programs of the Commonwealth. (Petition ¶36.) POM contends that the POM Game generates revenue for the Commonwealth in various ways. (Petition ¶37.)

POM maintains that the POM Game is not an illegal game of chance under the relevant statute of the Pennsylvania Crimes Code[2] governing illegal gambling devices. (Petition ¶¶38-39.) POM also alleges that in *In re Pace-O-Matic, Inc. Equipment, Terminal I.D. No. 142613* (C.P. Beaver, No. M.D. 965-2013, filed December 23, 2014), the Court of Common Pleas of Beaver County determined that a similar POM game was a game in which skill predominated and, thus, not a gambling device *per se* under Pennsylvania law.[3, 4] (Petition ¶48.) Consequently, POM requests that this Court enter a declaratory judgment in its favor and (1) declare that the POM Game is a legal device under Pennsylvania law; (2) declare that the City lacks the power and authority to seize or threaten to seize POM Games or initiate administrative or criminal proceedings regarding POM Games; (3) permanently enjoin the City from seizing or threatening to seize POM Games and/or initiating administrative or criminal proceedings regarding POM Games; and (4) grant any other relief deemed appropriate. (Petition ¶67.) POM also requests that we enter a preliminary injunction enjoining the

---

[2] 18 Pa.C.S. §§101-7707.

[3] In *Pace-O-Matic*, agents of the Pennsylvania Bureau of Liquor Control Enforcement seized coin-operated video devices from a social club. *Id.*, slip op. at 1-2. Like the POM Game at issue, the devices contained tic-tac-toe style puzzles that were played for money and offered rewards and dot-matching bonus games. *Id.*, slip op. at 2-4. The court of common pleas concluded that a machine is a gambling device *per se* where three elements are present: (1) consideration; (2) a result determined by chance, instead of skill; and (3) a reward. *Id.*, slip op. at 5. Because the court of common pleas determined that the outcome of both the tic-tac-toe and bonus games was determined predominantly by skill, rather than chance, it held that the Commonwealth failed to prove that the seized devices were gambling devices *per se*. *Id.*, slip op. at 10-12.

[4] Additionally, POM alleges that after the Beaver County decision, the District Attorney for Centre County issued a letter stating that, in light of the decision, her office would not confiscate POM machines. Similarly, POM avers that the District Attorney for Lancaster County issued a letter stating that for the reasons set forth in the Beaver County decision, the POM machine was not considered a game of chance under Pennsylvania gaming laws. (Petition ¶49.)

City from (1) seizing or threatening to seize POM Games; (2) initiating administrative or criminal proceedings regarding the POM Game; and (3) arresting or prosecuting persons in connection with operation of the POM Game. *Id.*

The Department filed an answer, new matter, and counterclaim in response to POM's petition for review.[5] In its counterclaim, the Department alleges that the POM Game is considered a slot machine under section 1103 of the Pennsylvania Race Horse Development and Gaming Act (Gaming Act), 4 Pa.C.S. §1103. (Counterclaim ¶18.) The Department also avers that the POM Game has not been inspected or certified by the Pennsylvania Gaming Control Board (Gaming Control Board) and that POM has been acting in violation of the Gaming Act.[6] (Counterclaim ¶¶20-21.) The Department also maintains that POM is a manufacturer of slot machines under section 1103 of the Gaming Act, 4 Pa.C.S. §1103, and that it has violated the Gaming Act by manufacturing slot machines without a manufacturer's license. (Counterclaim ¶¶25-27, 29-30.) Similarly, the Department contends that POM is a supplier of slot machines under the Gaming Act and that POM has violated the Gaming Act by distributing slot machines without a supplier license. (Counterclaim ¶¶37-40, 42.)

The Department seeks a declaration that (1) the Gaming Act regulates the manufacture, possession, and operation of slot machines; (2) the Gaming Act and its regulations prohibit any person from possessing a slot machine unless lawfully manufactured by a licensed manufacturer; (3) the Gaming Act prohibits the possession and operation of any slot machines unless on the premises of a licensed casino facility; (4) the POM Game is an illegal gambling device under the Gaming Act; (5) the POM

---

[5] The City also filed a separate answer and new matter in response to POM's petition for review.

[6] 4 Pa.C.S. §§1101-1904.

4

Game is a slot machine under the Gaming Act and subject to a daily tax of 34% of its revenue; and (6) POM is a manufacturer and/or supplier of slot machines and is required to obtain a license from the Gaming Control Board. (Counterclaim ¶51.) The Department also requests that POM be ordered to remove its machines from all Pennsylvania establishments and cease further sale and distribution of its machines within Pennsylvania unless and until POM obtains the proper licenses from the Gaming Control Board. (Counterclaim ¶52.) While the Department repeatedly argues that the POM Games are subject to the Gaming Act and the authority of the Gaming Control Board, the Gaming Control Board has not sought to intervene in this matter.

POM filed a reply to the Department's new matter and counterclaim. Thereafter, the Department filed an application for summary relief in the nature of a motion for partial judgment on the pleadings with respect to its counterclaim.

The Department raises the following issues in its application for summary relief in the nature of a motion for judgment on the pleadings:[7] (1) The POM Game is a slot machine under the Gaming Act; (2) POM is a manufacturer and/or a supplier of

---

[7] Rule 1532(b) of the Pennsylvania Rules of Appellate Procedure, which is titled "Summary relief," provides that "[a]t any time after the filing of a petition for review in an appellate or original jurisdiction matter the court may on application enter judgment if the right of the applicant thereto is clear." Pa.R.A.P. 1532(b). "A motion for judgment on the pleadings is in the nature of a demurrer"; thus, "all of the opposing party's allegations are viewed as true and only those facts which have been specifically admitted by him may be considered against him." *Trib Total Media, Inc. v. Highlands School District*, 3 A.3d 695, 698 n.2 (Pa. Cmwlth. 2010).

In reviewing a motion for judgment on the pleadings we "may only consider the pleadings themselves and any documents properly attached thereto." *Id.* The motion should only be granted "when the pleadings show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* Further, "the party moving for judgment on the pleadings must admit the truth of all the allegations of his adversary and the untruth of any of his own allegations that have been denied by the opposing party." *Pfister v. City of Philadelphia*, 963 A.2d 593, 597 (Pa. Cmwlth. 2009). Where "material issues of fact are in dispute, judgment on the pleadings cannot be entered." *Id.*

slot machines under the Gaming Act; and (3) POM is acting in violation of the Gaming Act.

## II. The Department's Argument

In support of its application, the Department argues that the Gaming Act sets forth a comprehensive regulatory structure that controls every aspect of gaming in the Commonwealth, including the manufacture, possession, and operation of slot machines. The Department notes that section 1102(1) of the Gaming Act provides that the primary objective of the Gaming Act is to "protect the public through the regulation and policing of all activities involving gaming and practices that continue to be unlawful." 4 Pa.C.S. §1102(1).[8] Consequently, the Department asserts that the General Assembly intended for the Gaming Act to regulate **all gaming** in Pennsylvania, including all slot machines, regardless of their location or whether they are "licensed" by the Gaming Control Board. The Department asserts that the Gaming Act regulates both legal and illegal gambling, including POM Games, which it contends constitute illegal gambling devices. It also avers that the General Assembly entrusted the Gaming Control Board with the authority to establish procedures for the inspection and certification of compliance of **all** slot machines, but that the POM Game has never been inspected or certified.

The Department argues that under the Gaming Act, a slot machine is defined as any mechanical device that is played for consideration and, whether by reason of skill or chance, provides anything of value. The Department argues that because POM admits in its petition for review that the POM Game is a skill-based

---

[8] Section 1102(1) of the Gaming Act provides, in full, as follows: "The primary objective of this part to which all other objectives and purposes are secondary is to protect the public through the regulation and policing of all activities involving gaming and practices that continue to be unlawful." 4 Pa.C.S. §1102(1).

6

game, the game is available to play upon payment of money/consideration, and the game provides a reward, POM's game is, by definition, considered a slot machine under the Gaming Act. The Department notes that in 2017 the definition of slot machine was amended to include both games of skill and of chance. Accordingly, it asserts that POM's game of skill fits squarely within the definition of slot machine under the Gaming Act. The Department alleges that POM is violating the Gaming Act because the POM Game is not being regulated and is not subject to monitoring or enforcement controls, and that POM's violations have prevented the Commonwealth from protecting the public from unregulated gaming activities, which is the primary intent of the Gaming Act.

The Department also argues that POM is, by definition, a manufacturer and supplier of slot machines under the Gaming Act. Because sections 1317 and 1317.1 of the Gaming Act, 4 Pa.C.S. §§1317, 1317.1,[9] require manufacturers and suppliers of slot machines to obtain licenses and POM does not hold the required licenses, the Department maintains that POM is violating the Gaming Act. Because it

---

[9] Section 1317 of the Gaming Act provides, in relevant part, the following:

> A manufacturer that elects to contract with a supplier under section 1317.1(d.1) (relating to manufacturer licenses) shall ensure that the supplier is appropriately licensed under this section. A person seeking to provide slot machines, table game devices or associated equipment, interactive gaming devices or associated equipment or multi-use computing devices to a slot machine licensee, an interactive gaming certificate holder or an interactive gaming operator within this Commonwealth through a contract with a licensed manufacturer shall apply to the board for the appropriate supplier license.

4 Pa.C.S. §1317. Section 1317.1 of the Gaming Act provides, in pertinent part, as follows: "A person seeking to manufacture slot machines, table game devices and associated equipment or interactive gaming devices and associated equipment for use in this Commonwealth shall apply to the board for a manufacturer license." 4 Pa.C.S. §1317.1.

alleges that there are no facts in dispute relating to its counterclaim, the Department asserts that it is entitled to judgment as a matter of law on its counterclaim.

### III. POM's Argument

In contrast, POM argues that its game is not a regulated gaming device under the Gaming Act because its game is not a regulated "skill slot machine," as defined by the statute, and the amended Gaming Act was never intended to change existing Pennsylvania law regarding what is an illegal gambling device. (POM's Br. at 7.) POM attempts to distinguish "gaming" from "gambling." POM contends that "gaming" occurs in licensed facilities regulated by the Gaming Control Board pursuant to the Gaming Act, whereas the Pennsylvania Crimes Code regulates alleged illegal "gambling" devices. POM also asserts that the 2017 amendments to the Gaming Act did not expand the scope of the Gaming Act, but continued to only regulate gaming in licensed facilities. POM contends that several well-established principles of statutory construction support its interpretation of the Gaming Act.

POM maintains that the POM Game is entirely outside of the regulatory scheme of the Gaming Act because the Gaming Act only applies to licensed games located in regulated gaming locations, such as casinos and horse racing tracks. Thus, POM argues that the Gaming Act does not regulate the types of places that operate the POM Game, including taverns, bars, restaurants and convenience stores. Moreover, POM alleges that if the POM Game is subject to the Gaming Act and, hence, illegal, so are arcade games located at establishments such as Chuck E. Cheese or Dave & Buster's. In addition, POM maintains that if the Department is correct that the POM Game is subject to the Gaming Act, then the Department has failed to join an indispensable party to the counterclaim, *i.e.*, the Gaming Control Board and, therefore, the counterclaim is jurisdictionally defective.

## IV. Analysis

### A. "Slot Machine," "Manufacturer," and "Supplier" of Slot Machines Under the Gaming Act.

We first address the definitions of "Slot machine," "Manufacturer," and "Supplier" under the Gaming Act to determine whether—if the Gaming Act applies to unlicensed slot machines—the POM Game would be considered a slot machine and POM a manufacturer and/or supplier of slot machines. Thus, at the outset, we are merely deciding whether, based on the factual allegations, the POM Games are slot machines pursuant to the definitions in the Gaming Act. If the POM Games do not fit within the definitions, our analysis ends at this stage because the Gaming Act would not apply to the POM Game under any circumstances. On the other hand, if the POM Game does fit within the slot machine definitions, we will next determine whether the Gaming Act applies to unlicensed slot machines like the POM Game.

The Department argues that, based on POM's factual allegations, POM's activities vis-à-vis its game fit squarely within the definitions of "Slot Machine," "Manufacturer," and "Supplier." If the Department is correct that, based on the factual allegations in the pleadings, POM's activities fit within these definitions, then the question of whether the Gaming Act applies to POM's activities would be a pure question of law.

"Slot machine" is defined under the Gaming Act as follows:

(1) The term includes:

> (i) **Any mechanical, electrical or computerized contrivance, terminal, machine or other device approved by the Pennsylvania Gaming Control Board** which, upon insertion of a coin, bill, ticket, token or similar object therein or upon payment of any consideration whatsoever, . . . is available to play or operate, **the play or operation of which, whether by**

9

**reason of skill or application of the element of chance or both**:

(A) **May deliver or entitle the person or persons playing or operating the contrivance, terminal, machine or other device to receive cash, billets, tickets, tokens or electronic credits to be exchanged for cash or to receive merchandise or anything of value whatsoever**, . . . .

. . .

(iii) **A skill slot machine**, **hybrid slot machine** . . . .

(iv) A slot machine used in a multistate wide-area progressive slot machine system and devices and associated equipment as defined by the Pennsylvania Gaming Control Board through regulations.

(v) A multi-use computing device which is capable of simulating, either digitally or electronically, a slot machine.

Section 1103 of the Gaming Act, 4 Pa.C.S. §1103 (emphasis added). Further, a "Skill slot machine" is defined as "[a] slot machine in which the skill of the player, rather than the element of chance is the predominant factor in affecting the outcome of the game," and "Hybrid slot machine" is defined as "[a] slot machine in which a combination of the skill of the player and elements of chance affect the outcome of the game." *Id.* Therefore, if a player must primarily use skill to affect the game's result, it is considered a "Skill slot machine." If the skill of the player is not the primary factor, but outcome of the game is affected by both skill and chance, it is a "Hybrid slot machine."

In its petition, POM alleges that the POM Game is a coin-operated video machine that provides a reward of up to a combined total of 105% of the original

10

amount spent to play. (Petition ¶¶13, 28.) POM also states that for the purposes of its petition it does not dispute that its game requires consideration to play and provides a reward. (Petition ¶44.) POM avers that the POM Game is a game of skill because the element of skill predominates over the element of chance. (Petition ¶¶29, 47, 50.)

Section 1103 of the Gaming Act defines "Slot machine" as any mechanical or computerized machine, which upon payment of a coin or any consideration provides something of value. The definition includes what are termed "Skill slot machines," which are defined as slot machines where the skill of the player is the predominant factor in determining the outcome of the game. Because POM alleges that its game requires consideration to play, provides something of value, and is skill-based, if POM's activities are subject to the Gaming Act, then the POM Game fits within the definition of "Slot machine" under the Gaming Act. Similarly, since POM alleges that players of the POM game must use skill, if the Gaming Act applies to unlicensed games then the POM Game would fit within the definition of "Skill slot machine" under the Act.

"Manufacturer" is defined, in pertinent part, under section 1103 of the Gaming Act as, "A person who **manufactures, builds, rebuilds, fabricates, assembles, produces, programs, designs or otherwise makes modifications to any slot machine** . . . . *Id.* (emphasis added). Under this definition, if the Gaming Act applies to POM's activities, POM is a "Manufacturer" of slot machines because it alleges that it "designs . . . the essential components" of the POM Game. (Petition ¶56.)

"Supplier" is defined, in relevant part, as follows: "A person that **sells, leases, offers or otherwise provides, distributes or services any slot machine** . . . in this Commonwealth. *Id.* (emphasis added). Likewise, if the Gaming Act were to apply to POM's activities, POM's factual allegations would also establish POM as a "Supplier" of slot machines. For example, POM avers that it "sells the essential

11

components" of the POM Game, that it distributes software for the POM Game, (Petition ¶¶1, 56), and admits that it does not hold a manufacturer's license under the Gaming Act (Reply to Counterclaim ¶30). The definition of "Supplier" includes anyone that sells or distributes slot machines. As POM alleges it sells and distributes the POM Game, it would also be considered a supplier of slot machines under the Gaming Act.

Accordingly, there is one dispositive question remaining before us, which is a pure question of law: whether the Gaming Act applies to POM's conduct.[10] As argued by the Department, the Gaming Act sets forth a comprehensive regulatory regime that applies to both legal and illegal gambling, including POM's allegedly illegal game. To answer the question of whether the Gaming Act applies to the POM Game, we must analyze the language of the Gaming Act to determine the overall intent of the General Assembly in enacting the Gaming Act and its amendments.

## B. Whether, As a Matter of Law, the Gaming Act Applies to POM's Activities.

### 1. Gaming Act Statutory Framework.

We now turn to the crux of the matter, *i.e.*, whether the Gaming Act applies to the unlicensed POM Game. In order to answer this question we must first conduct a review of the statutory framework of the Gaming Act.

Section 1102 of the Gaming Act, titled "Legislative intent," provides, in part, as follows:

---

[10] POM argues that there are certain material issues of fact that preclude summary relief for the Department. In particular, POM maintains that (1) the Department makes several **policy** arguments that are predicated on unsupported factual assertions and (2) the Gaming Act has historically not been applied to similar circumstances, which necessitates discovery of pertinent formal guidance documents and interpretive rules in the possession of the Department and the Gaming Control Board. However, questions of policy and the potential existence of interpretive guidelines do not present genuine issues of material fact with respect to the fundamental question of whether, given the facts alleged by POM, the Gaming Act should be interpreted to apply to the POM Game.

The General Assembly recognizes the following public policy purposes and declares that the following objectives of the Commonwealth are to be served by this part:

(1) The primary objective of this part to which all other objectives and purposes are secondary is to protect the public through the regulation and policing of all activities involving gaming and practices that continue to be unlawful.

(2) **The authorization of limited gaming by the installation and operation of slot machines as authorized in this part** is intended to enhance live **horse racing, breeding programs, entertainment and employment** in this Commonwealth.

. . .

(4) The authorization of limited gaming is intended to positively assist the Commonwealth's horse racing industry, support programs intended to foster and promote horse breeding and improve the living and working conditions of personnel who work and reside in and around the stable and backside areas of racetracks.

. . .

(8) **Strictly monitored and enforced control over all limited gaming authorized by this part** shall be provided through regulation, licensing and appropriate enforcement actions of specified locations, persons, associations, practices, activities, licensees, permittees, registrants and certificate holders.

. . .

(12) It is the intent of the General Assembly to authorize the operation and play of slot machines, table games and interactive gaming **under a single slot machine license issued to a slot machine licensee <u>when</u> a slot machine licensee has been issued a table game operation certificate and an interactive gaming certificate under this part.**

13

4 Pa.C.S. §1102 (emphasis added). Therefore, based on the language of section 1102, the intent of the Gaming Act is to protect the public from unlawful gaming activity, enhance live horse racing, breeding programs, entertainment and employment, and to regulate **licensed** slot machines when the licensee has been issued a table game operation certificate and an interactive gaming certificate. The POM Games are not used for any of the noted activities intended to be monitored by the Gaming Board.

Section 1103 of the Gaming Act, the Act's "definitions" provision, defines a "Licensed entity," as "[a]ny slot machine licensee, manufacturer licensee, supplier licensee or other person **licensed by the Pennsylvania Gaming Control Board under this part**," 4 Pa.C.S. §1103 (emphasis added). "Licensed facility" is defined, in part, as "[t]he physical land-based location at which **a licensed gaming entity is authorized to place and operate slot machines**." *Id.* (emphasis added). Section 1103 also provides that a "Licensed gaming entity" or "slot machine licensee" is "[a] person that **holds a slot machine license** pursuant to this part." *Id.* (emphasis added). Thus far, we see that, a licensed entity is an entity that has **obtained a license** from the Gaming Control Board, and a licensed facility is a location where a licensed entity has been **authorized** by the Gaming Control Board to operate slot machines. These definitions, when applied here, stand in stark contrast to POM's status as an unlicensed entity.

A closer look at several of the provisions of the Gaming Act indicates the type of slot machine activities the Act is intended to regulate. Section 1301 of the Gaming Act provides for three distinct classifications of slot machine licenses. 4 Pa.C.S. §1301. Section 1302, titled "Category 1 slot machine license," permits licensed slot machines at certain "**licensed racetrack facilit[ies]**" that have been issued licenses by the State Horse Racing Commission or State Harness Racing Commission to conduct thoroughbred or harness races. 4 Pa.C.S. §1302 (emphasis added). Section 1304, titled "Category 2 slot machine license," allows applicants, not otherwise available to apply for Category 1 licenses, to "seek[] to locate a **licensed facility** in a

14

city of the first class, a city of the second class or a revenue—or tourism—enhanced location." 4 Pa.C.S. §1304 (emphasis added).[11] A "licensed facility," includes any "area of a **licensed racetrack**," "board-approved interim facility or temporary facility," "area of a **hotel** which the [Board] determines is suitable to conduct table games," or "area of a licensed facility where casino simulcasting is conducted, as approved" by the Board. Section 1103 of the Gaming Act, 4 Pa.C.S. §1103 (emphasis added). Section 1305, titled "Category 3 slot machine license," allows applicants that have not applied for or been approved or issued a Category 1 or 2 license to obtain a Category 3 license for a "licensed facility in a well-established **resort hotel having no fewer than 275 guest rooms** under common ownership and having substantial year-round recreational guest amenities." 4 Pa.C.S. §1305 (emphasis added). *Id.*[12, 13] The Gaming Act permits, with certain exceptions, no more than seven Category 1 licensed facilities, five Category 2 licensed facilities, and two Category 3 facilities. Section 1307 of the

---

[11] The Gaming Act permits Category 1 and 2 licensees to operate up to **3,000 slot machines** at any one licensed facility and, under certain circumstances, apply to operate an additional **2,000 slot machines** at a licensed facility; such licensees, however, are required to operate and make available to play a minimum of **1,500 slot machines** at a licensed facility. Section 1210 of the Gaming Act, 4 Pa.C.S. §1210. Successful Category 1 and Category 2 license applicants are required to pay a one-time slot machine license fee in the amount of $50,000,000. Section 1209 of the Gaming Act, 4 Pa.C.S. §1209.

[12] A maximum of **500 slot machines** are permitted at a Category 3 licensed facility, unless the licensee also holds a table game operation certificate, which entitles the licensee to operate up to **600 slot machines**. Section 1305 of the Gaming Act, 4 Pa.C.S. §1305. Under certain circumstances, Category 3 licensees may obtain approval for an additional 250 slot machines. *Id.* Successful applicants must pay a one-time fee of $5,000,000, and an additional fee of $2,500,000 if additional slot machines are approved. *Id.*

[13] In 2017, the General Assembly amended the Gaming Act to permit current slot machine licensees to submit bids for so-called "Category 4 slot machine license[s]." Section 1305.1 of the Act of October 30, 2017, P.L. 419, 4 Pa.C.S. §1305.1. Only ten of these licenses are permitted and they may not be placed within 25 linear miles of the winning bidder's preexisting licensed facility. *Id.*

Gaming Act, 4 Pa.C.S. §1307. Clearly, the above enumerated sections indicate that the Gaming Act was intended to authorize and regulate large-scale slot machine operations involving hundreds or thousands of slot machines, and there is no suggestion that the Act was ever intended to apply to devices in taverns, and/or social clubs, such as the game in question.

Further, section 1202(a)(1) of the Gaming Act states that the Gaming Control Board "shall have general and sole regulatory authority over the **conduct of gaming and related activities <u>as described in this part</u>**" and that the Gaming Control Board "shall ensure the integrity of the acquisition and operation of slot machines . . . and shall have sole authority over every aspect of the authorization, operation, and play of slot machines." 4 Pa.C.S. §1202(a)(1). "Conduct of gaming" is defined in the Gaming Act as "[t]he **licensed** placement, operation and play of slot machines . . . **under this part, as authorized and approved by the Pennsylvania Gaming Control Board**." 4 Pa.C.S. §1103 (emphasis added). The Gaming Control Board further has the specific power and duty "[a]t its discretion, to issue, approve, renew, revoke, suspend, condition or deny issuance or renewal of slot machine licenses." Section 1202(b)(12) of the Gaming Act, 4 Pa.C.S. §1202(b)(12). While these sections state that the Gaming Control Board has general and regulatory authority over slot machines, such authority must be viewed through the lens of the limiting clause stating that the Board has authority over the "conduct of gaming," **as described in this part** and which is defined as the **licensed** placement and operation of slot machines **as authorized and approved by the Board**.

> The Gaming Control Board is also given the power to, *inter alia*,
>
> (1) Deny, deny the renewal, revoke, condition or suspend any license, permit, certificate, registration or other authorization provided for in this part . . .
>
> . . .

16

(3) Prescribe and require periodic financial reporting and internal control requirements for **all licensed entities**.

. . .

(9) Establish procedures for the inspection and certification of compliance of each slot machine . . . prior to being placed into use by a **slot machine licensee**. . . .

. . .

(11) **Require each slot machine <u>license applicant</u>** to provide detailed site plans of its **proposed licensed facility** which shall be reviewed and approved by the board for the purpose of determining the adequacy of the proposed security and surveillance measures inside and outside the facility. . . .

. . .

(21.1) Authorize, at its discretion, **a slot machine licensee** to place slot machines that are used in a multistate wide-area progressive slot machine system, skill slot machines or hybrid slot machines and **make them available for play at licensed facilities**.

(21.2) Adopt and promulgate regulations to govern the operation and placement of skill slot machines and hybrid slot machines by slot machine licensees at **licensed facilities** in the same manner as provided in section 13B03 (relating to regulations).

Section 1207 of the Gaming Act, 4 Pa.C.S. §1207 (emphasis added).  As already noted, the license applicants for slot machines under the Gaming Act are those that are operating or intend to operate licensed racetrack facilities, large hotels and resort hotels with casinos and section 1207 further underscores that the Board's authority mainly applies to these licensed slot machines, rather than unlicensed or otherwise illegal devices.

17

The Gaming Act also establishes within the Gaming Control Board a "Bureau of Investigations and Enforcement" (Bureau), which is given the power to, *inter alia*, "[i]nvestigate and review **all applicants and applications for a license, permit or registration**" and "[i]nvestigate **licensees, permittees, registrants and other persons regulated by the board for noncriminal violations** of this part." Section 1517(a.1)(2)-(3) of the Gaming Act, 4 Pa.C.S. §1517(a.1)(2)-(3) (emphasis added). The Gaming Act further provides that the Bureau has the power to "[i]nspect and examine **licensed entities** as provided in subsection (e)." Section 1517(a.1)(5) of the Gaming Act, 4 Pa.C.S. §1517(a.1)(5) (emphasis added). Section 1518(a)(3), titled "Prohibited acts; penalties," makes it a criminal offense for "any **licensed entity**. . . or any other person to permit a slot machine to be operated, transported, repaired or opened **on the premises of a licensed facility** by a person other than a person licensed or permitted by the [Board] pursuant to this part." 4 Pa.C.S. §1518(a)(3) (emphasis added).[14] Further, section 1518(a)(4) makes it a criminal offense "for any licensed entity or other person to manufacture, supply or place slot machines into play or display slot machines **on the premises of a licensed facility** without the authority" of the

---

[14] *Compare* Section 1518(a)(3) of the Gaming Act, 4 Pa.C.S. §1518(a)(3), *with* section 3501 of the Gaming Act, 4 Pa.C.S. §3501 (titled "General Prohibition," and providing that "[**n]o person** may offer or otherwise **make available for play in this Commonwealth** a video gaming terminal **unless the person is licensed** under this part" (emphasis added)), *and* section 13C04 of the Gaming Act, 4 Pa.C.S. §13C04 (titled "Unauthorized sports wagering," and making it a criminal offense "for any person to operate, conduct, offer or expose sports wagering for play or to accept a bet or wager associated with sports wagering from any person physically located in this Commonwealth which at the time of play that is not within the scope of a valid sports wagering certificate issued by the [Gaming Control Board] . . . ."), *and* section 13C71 of the Gaming Act, 4 Pa.C.S. §13C71 (titled "Criminal activity," and providing that "Sports wagering conducted by a sports wagering certificate holder in accordance with this chapter shall not constitute a criminal activity under 18 Pa.C.S. §5514 (relating to pool selling and bookmaking).").

Board. 4 Pa.C.S. §1518(a)(4) (emphasis added).[15] These provisions demonstrate that although the Bureau has the authority to investigate and inspect licensees, permittees, and licensed entities it does not have the authority to investigate and inspect unlicensed entities. More importantly, however, is the fact that although the Act makes it unlawful to place slot machines on the **premises of a licensed facility** without the authority of the Gaming Control Board, it does not make it unlawful to place a slot machine in an **unlicensed location**.

The Department's position is that the above statutory framework authorizes it to regulate both legal and illegal gambling. But POM argues that the Department has no such authority as the Gaming Act only repeals any provisions in the Crimes Code that are inconsistent with it. *See* section 1903(a)(2) of the Gaming Act, 4 Pa.C.S. §1903(a)(2) (providing that "[t]he provisions of 18 Pa.C.S. §5513(a) are repealed insofar as they are inconsistent with this part"). The Crimes Code, under section 5513(a), titled "Gambling devices, gambling, etc.," states that a person is guilty of a first degree misdemeanor if he does any of the following:

> (1) intentionally or knowingly makes, assembles, sets up, maintains, sells, lends, leases, gives away, or offers for sale, loan, lease or gift, any punch board, drawing card, slot machine or any device to be used for gambling purposes, except playing cards;
> (2) allows persons to collect and assemble for the purpose of unlawful gambling at any place under his control;
> (3) solicits or invites any person to visit any unlawful gambling place for the purpose of gambling; or
> (4) being the owner, tenant, lessee or occupant of any premises, knowingly permits or suffers the same, or any part thereof, to be used for the purpose of unlawful gambling.

---

[15] *Compare* Section 1518(a)(4) of the Gaming Act, 4 Pa.C.S. §1518(a)(4), *with* section 3508(a) of the Gaming Act, 4 Pa.C.S. §3508(a) ("A person seeking to manufacture video gaming terminals, redemption terminals and associated equipment for use in this Commonwealth must apply to the [Board] for a manufacturer license.").

19

18 Pa.C.S. §5513(a). Moreover, the Pennsylvania State Police, Bureau of Liquor Control Enforcement, when investigating whether "there are reasonable grounds to believe liquor, alcohol or malt or brewed beverages are being sold on premises not licensed," has the power to arrest any person in violation of section 5513 of the Crimes Code. Section 211 of the Liquor Code, Act of April 12, 1951, P.L. 90, *as amended*, 47 P.S. §2-211. Thus, the Crimes Code defines what constitutes illegal gambling, and the Liquor Code gives the Pennsylvania State Police primary enforcement duties with respect to illegal gambling occurring at premises where unlicensed liquor sales are also taking place.

**2. Whether the Gaming Act was Intended to Regulate All Unlicensed and/ or Illegal Slot Machines and Other Gambling Devices in the Commonwealth.**

In light of the above statutory framework, we are faced with the question of whether the General Assembly intended that the regulation of all illegal slot machines and other gambling devices in the Commonwealth is within the purview of the Gaming Act. In other words, we must decide whether the General Assembly intended for the Gaming Act to comprehensively regulate all gambling in the Commonwealth and, thus, apply to both legal and illegal gambling.

When interpreting the Gaming Act our paramount objective must be to ascertain and effectuate the intention of the General Assembly. *See* Section 1921 of the Statutory Construction Act of 1972 (Statutory Construction Act), 1 Pa.C.S. §1921(a) ("The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly."). Moreover, "[e]very statute must be construed, if possible, to give effect to all its provisions." *Id.* Thus, when construing a statute, a court "must attempt to give meaning to every word in a statute, as we cannot assume that the legislature intended any words to be mere surplusage." *City of Philadelphia Fire Department v. Workers' Compensation Appeal Board*

*(Sladek)*, 195 A.3d 197, 207 (Pa. 2018). Additionally, "[i]n construing and giving effect to the text, 'we should not interpret statutory words in isolation, but must read them with reference to the context in which they appear.'" *A.S. v. Pennsylvania State Police*, 143 A.3d 896, 906 (Pa. 2016) (quoting *Roethlein v. Portnoff Law Associates, Ltd.*, 81 A.3d 816, 822 (Pa. 2003)).

For the following reasons, however, we conclude that the Gaming Act does not apply to unlicensed and/or illegal slot machines. First, the Gaming Act does not give the Gaming Control Board the jurisdiction or authority it now claims. As indicated by sections 1301-1302 and 1304-1305 of the Gaming Act, 4 Pa.C.S. §§1301-1302, 1304-1305, the Gaming Act was intended to license slot machine operations at racetracks, casinos, hotels, and established resort hotels. Thus, its intent was to provide licenses to large, individual slot machine operations that raise millions of dollars in revenue. The POM Games are not located at any of these types of facilities and there is absolutely no suggestion in these provisions of the Gaming Act, or any other provisions of the Act, that the Gaming Act was intended to apply to the facilities where the POM Games are located, *e.g.*, taverns and social clubs, or that the Gaming Act regulates the placement of slot machines at such facilities.

Moreover, the Gaming Act specifically regulates **licensed** slot machines in **licensed facilities.** In particular, section 1103 of the Gaming Act defines slot machines as devices that are **approved** by the Gaming Control Board. 4 Pa.C.S. §1103. Section 1103 also defines licensed entities as persons **licensed by the Gaming Control Board under the Gaming Act** and gaming facilities as the locations at which **licensed gaming entities are authorized to place and operate slot machines**. *Id.* The definitional provisions of the Gaming Act clearly demonstrate that the General Assembly intended for the Gaming Act to regulate slot machines that are **licensed and approved by the Gaming Control Board**, not those that are illegal or unlicensed. The Department argues that the POM Games are illegal; however, even if we were to

21

assume *arguendo* they are illegal and thus in violation of the Crimes Code, there is nothing in the Gaming Act to suggest the General Assembly intended for the Gaming Control Board to also have the authority to regulate gambling devices that are unlawful pursuant to the Crimes Code.

Further, while section 1202(a)(1) of the Gaming Act, 4 Pa.C.S. §1202(a)(1), provides that the Gaming Control Board has sole authority over every aspect of the authorization and operation of slot machines, the preceding clause in that provision states that the Gaming Control Board only has general and sole regulatory authority over the **conduct of gaming**, which is defined in section 1103, as the "**licensed** placement" and "operation" of slot machines, "**under this part, as authorized and approved by the** . . . **Gaming Control Board**," 4 Pa.C.S. §1103 (emphasis added). As it is a basic principle of statutory construction that a particular provision controls the general, *see* Section 1933 of the Statutory Construction Act, 1 Pa.C.S. §1933, under section 1202 of the Gaming Act the Gaming Control Board only has regulatory authority with respect to the **licensed** placement of slot machines as authorized under the Act and, thus, does not have regulatory authority over **all** slot machines in the Commonwealth.

The legislative intent outlined in the Gaming Act also demonstrates that the General Assembly only intended the Gaming Act to regulate **legal** and **licensed** gaming. Of particular importance, section 1102(8) provides that one of the objectives of the Gaming Act is to **provide strict monitoring** "**and enforced control over all limited gaming authorized**" by the Gaming Act. 4 Pa.C.S. §1102(8) (emphasis added). Section 1102(8) does **not** state that it is the General Assembly's intention to provide strict monitoring and enforced control **over all gambling in the Commonwealth, whether legal or illegal**, but merely that the General Assembly intended to strictly control the limited gaming authorized by the Gaming Act.

The conclusion that the Gaming Act only regulates licensed slot machines

is further bolstered by section 1517(a.1)(5) of the Gaming Act, which gives the Bureau the power to inspect and examine "**licensed entities**," 4 Pa.C.S. §1517(a.1)(5) (emphasis added), and section 1517(a.1)(3), 4 Pa.C.S. § 1517(a.1)(3), which gives the Bureau the authority to investigate **license applicants**, **licensees**, and **permittees**. If the General Assembly had intended for the Gaming Act to regulate illegal gambling, in addition to licensed, legal gaming, the General Assembly would likely have given the Bureau the power to inspect, examine, and investigate **unlicensed entities**, such as taverns, bars, restaurants and convenience stores, where the POM Games are present. However, the General Assembly did not do so. Courts cannot assume that an agency has been bestowed additional powers that are not present in or inferable from statutory language.

Section 1518 of the Gaming Act also provides strong evidence that the General Assembly did not intend for the Gaming Act to regulate unlicensed/illegal slot machines. Section 1518, 4 Pa.C.S. §1518, makes it unlawful for any person to permit a slot machine to be opened on the premises of a **licensed facility** unless licensed by the Board, and makes it illegal to manufacture, supply, or place slot machines into play at a **licensed facility** without the authority of the Gaming Control Board. However, neither section 1518 nor any other provision in the Gaming Act makes it unlawful for any person to manufacture, supply, or place slot machines at **unlicensed facilities** or generally unlawful to display or operate slot machines when **not authorized** by the Gaming Control Board. In contrast, section 3501 of the Gaming Act, 4 Pa.C.S. §3501, makes it unlawful for any person to make available for play video gaming terminals unless that person is licensed by the Gaming Control Board, section 3508, 4 Pa.C.S. §3508, requires a person seeking to manufacture video gaming terminals to apply for a license with the Board, and section 13C71, 4 Pa.C.S. §13C71, states that sports wagering conducted by an entity that holds a sports wagering certificate does not constitute criminal activity. Accordingly, whereas the provisions of the Gaming Act

23

dealing with video gaming terminals and sports wagering indicate that the General Assembly intended for the Board to have exclusive regulatory authority over such activities, section 1518 indicates the opposite with respect to slot machines.

Moreover, the Gaming Act bestows the Gaming Control Board with the power to, *inter alia*, deny or suspend slot machine licenses; establish procedures and financial reporting requirements for **slot machine licensees**; and adopt and promulgate regulations to govern the operation and placement of slot machines by slot machine licensees at **licensed facilities**. Section 1207 of the Gaming Act, 4 Pa.C.S. §1207. There is no indication in section 1207 that the Gaming Control Board was given comprehensive authority over all illegal gambling activities in the Commonwealth, nor can we create such authority. Therefore, even if the POM Games were considered illegal gambling devices, illegal devices have been historically regulated by the Crimes Code and the Gaming Act does not provide any authority for regulating such devices.

Due to the language in the Gaming Act discussing the regulation of licensed slot machines and facilities, we simply cannot glean any intention by the General Assembly for the Gaming Act to regulate all unlicensed and illegal slot machines in the Commonwealth. Moreover, the various references to racetracks, hotels, and casinos in the Gaming Act indicate that it only regulates slot machines at these types of licensed facilities/locations, and not the locations at issue, such as taverns, social clubs, and restaurants. In addition, were we to accept the Department's argument that the Gaming Act applies to unlicensed slot machines, it would render the multiple references in the Gaming Act to **licensed** slot machines, **approved** slot machines, **licensed** entities, and **licensed** facilities mere surplusage, which is not permissible under basic statutory construction principles. *See, e.g.*, *City of Philadelphia Fire Department*, 195 A.3d at 207 (holding that pursuant to section 1921(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. §1921(a), when "construing a statute, the courts must attempt to give meaning to every word in a

24

statute, as we cannot assume that the legislature intended any words to be mere surplusage"). Accordingly, based on the overall framework and context of the Gaming Act, we hold that it only applies to licensed slot machines in licensed entities/facilities and does not apply to unlicensed and illegal devices.

Our conclusion that the Gaming Act does not apply to the unlicensed POM Game is further bolstered by comments made during the 2004 Senate floor debate for the Gaming Act.[16] During the debate, Senator Vincent Fumo made the following prepared statement:

> [A]t no time has this bill's original purpose changed. This bill was originally introduced to provide for a manner of regulating the Pennsylvania horseracing industry. This purpose has not changed. The amendment we offered furthers the regulation of the Pennsylvania horseracing industry and funds many of the horse development functions with a direct subsidy from the legalization of gaming operations throughout the Commonwealth. The original purpose has never changed. . . . [T]his bill embraces only one subject as expressed in its drafting as an amendment to Title 4 of the Pennsylvania Consolidated Statutes, in this case, the subject of amusements or more specifically, Pennsylvania horseracing. A new chapter to Title 4 has been added, entitled, the Pennsylvania Racehorse Development and Gaming Act, of which slot machine operations are the revenue engine through which Pennsylvania may enhance horseracing opportunities. Simply stated, though the media simplification of this issue is slot machines, the public policy

---

[16] The Statutory Construction Act specifically authorizes consideration of legislative history when construction of a statute, beyond its plain language, is required. *See* 1 Pa.C.S. §1921(c)(7). Although lawmakers' statements during debate are generally not dispositive of legislative intent, they may properly be considered as part of the contemporaneous legislative history. *Arneson v. Wolf*, 117 A.3d 374, 384 n.10 (Pa. Cmwlth.), *aff'd*, 124 A.3d 1225 (Pa. 2015); *see also Board of Revision of Taxes v. City of Philadelphia*, 4 A.3d 610, 624 n.10 (Pa. 2010) (noting that although legislators' statements during floor debate are not dispositive, they can be instructive to our analysis and persuasive evidence of the General Assembly's intent).

purpose that carries throughout every provision of this Act is the development of the horseracing industry.

Legislative Journal—Senate, 188th Sess., July 1, 2004, at 1992. Thus, the legislative history demonstrates that when the Gaming Act was first enacted, its intent was to further regulate the horse racing industry and support the industry by providing it revenue from slot machines. The legislative history does not demonstrate that the General Assembly intended for the Gaming Act to regulate all unlicensed and/or illegal slot machines then existing in the Commonwealth.

Additionally, during the same floor debate, Senator Robert Tomlinson stated that although it would take several years before all of the racetrack facilities were up and running, the projected revenue from those facilities was $2.4 billion to $2.9 billion. *Id.* at 1954. Senator Fumo also explained that the bill would "generate an economic development fund that [would] yield $2 billion in money for projects throughout the State" and that in Philadelphia, alone, it was projected that as much as $200 million to $300 million would be spent on each slot machine operation. *Id.* at 1990-1991. He noted that under the bill, Pennsylvania would be the first state to charge a $50 million fee for a gambling license. *Id.* at 1991. Senator Fumo also stated that although gambling is a problem, "We already have gambling. We have gambling at the very racetracks we are trying to save. We have gambling with the Pennsylvania Lottery, and if you have not looked in your local bar, go take a look at the illegal machines that are in there." *Id.* Senator Fumo further stated that, "As far as our horsemen are concerned, they do need help." *Id.* Thus, according to the legislative history, the Gaming Act was meant to legalize slot machines at large-scale facilities in order to aid the horse racing industry and there is no indication that the Gaming Act was intended to apply to or regulate illegal machines already existing at bars and taverns.

This conclusion is further corroborated by remarks made during the floor debate for the 2017 amendments to the Gaming Act. Specifically, during the floor debate, the following exchange occurred with Representative Jason Ortitay, the prime sponsor of the 2017 amendments:

> Mr. STURLA: Mr. Speaker, will the prime sponsor of the bill rise for brief interrogation?
> The SPEAKER. Representative Ortitay. He will stand for interrogation. He is glad to do so.
> Mr. STURLA. Thank you, Mr. Speaker. Mr. Speaker, the previous speaker said that **he believes that the language in this bill will make illegal all games of skill in the State of Pennsylvania that currently exist, all the ones that exist currently at truckstops and convenience stores and social clubs and taverns throughout the State of Pennsylvania**. Would you agree with that assessment?
> Mr. ORTITAY. **I do not believe so**, Mr. Speaker.

Legislative Journal—House, 201st Sess., October 25, 2017, at 1174 (emphasis added).

Therefore, based on both the plain language of the Gaming Act, as well as its legislative history, we conclude that unlicensed slot machines and/or slot machines that **are not approved** by the Gaming Control Board, such as the POM Game, are not subject to the Gaming Act.[17] Consequently, we hold that even if the POM Game were considered an illegal gambling device, the Gaming Act does not give the Gaming Control Board the power to regulate illegal gambling devices.

---

[17] Of course, we do not answer the separate question of whether the POM Game qualifies as an illegal gambling device under section 5513 of the Crimes Code, which both parties appear to acknowledge presents a question of fact that requires factual discovery to resolve.

**3. Whether the Gaming Act Supersedes the Crimes Code's Regulation of Unlicensed Gambling Devices.**

Our conclusion is enhanced by an analysis of whether the General Assembly intended the Gaming Act to supplant the Crimes Code's regulation of unlicensed slot machines and illegal gambling devices. The Department contends that "[t]he Gaming Act sets forth a comprehensive regulatory structure that controls and provides oversight for every aspect of gaming in the Commonwealth." (Department's Br. at 9.) It argues that the General Assembly intended the Gaming Act to regulate all gaming in the Commonwealth and that, regardless of the Crimes Code, the POM Game is a slot machine pursuant to the Gaming Act. Conversely, POM maintains that there is a strong presumption that a statute does not impliedly repeal another statute and, therefore, that the Gaming Act did not displace section 5513 of the Crimes Code, as it pertains to gambling devices. We agree with POM.

Under section 1971 of the Statutory Construction Act of 1972, when a statute "purports to be a revision of all statutes upon a particular subject, [] sets up a general or exclusive system covering the entire subject matter of a former statute and is intended as a substitute for such former statute," or "purports to establish a uniform and mandatory system covering a class of subjects," the statute will be construed to supply and to repeal any preexisting local or special statutes on the same class of subjects. 1 Pa.C.S. §1971. However, "in all other cases, a later statute shall not be construed to supply or repeal an earlier statute unless the two statutes are irreconcilable." *Id.*

Thus, "[w]hen a statute sets up a general or exclusive system covering the entire subject matter of a former statute and is intended as a substitute for such former statutes upon the same subject, the former statute is impliedly repealed." *Licensed Beverage Association of Philadelphia v. Board of Education of School District of Philadelphia*, 669 A.2d 447, 450 (Pa. Cmwlth. 1995), *abrogated on different grounds*

28

*by Buffalo Township v. Jones*, 813 A.2d 659 (Pa. 2002). Yet, "there is a very strong presumption that a statute does not impliedly repeal another statute." *Borough of Emmaus v. Pennsylvania Labor Relations Board*, 156 A.3d 384, 398 n.9 (Pa. Cmwlth. 2017); *see also In re Delinquent Tax Sale*, 477 A.2d 603, 605 (Pa. Cmwlth. 1984) (noting that "implied repeals are not favored by the law"); *City of Pittsburgh v. Pennsylvania Public Utility Commission*, 284 A.2d 808, 811 (Pa. Cmwlth. 1971) (concluding "there is a presumption against implied repeal"). "The question of whether a statute has been impliedly repealed by a later statute is exclusively a question of legislative intent." *HSP Gaming, L.P. v. City of Philadelphia*, 954 A.2d 1156, 1175 (Pa. 2008). Because repeals by implication are not favored, they "will not be implied unless there be an irreconcilable conflict between statutes embracing the same subject matter." *Id.* Moreover, since implied repeals are not favored, "legislative intent to repeal a statute by enacting another must be clearly shown." *Id.*

Here, section 5513(a) of the Crimes Code makes it illegal to "intentionally or knowingly make[], assemble[], set[] up, maintain[], sell[], lease[], give[] away, or offer[] for sale, loan, lease or gift any . . . slot machine or any device to be used for gambling purposes." 18 Pa.C.S. §5513(a). Further, section 211 of the Liquor Code, 47 P.S. §2-211, gives the Pennsylvania State Police, Bureau of Liquor Control Enforcement, the power and duty to enforce section 5513 of the Crimes Code in the course of investigating Liquor Code violations. Additionally, section 1903(a)(2) of the Gaming Act, 4 Pa.C.S. §1903(a)(2), mandates that provisions of section 5513(a) of the Crimes Code are only repealed to the extent they are inconsistent with the Gaming Act.

The Department essentially argues that the Gaming Act establishes a uniform system for all gambling in the Commonwealth, regardless of whether the gambling is legal or illegal. Under this interpretation, the Gaming Act would effectively supersede and displace section 5513(a)'s prohibition of illegal gambling. In effect, illegal gambling would be governed by the Gaming Act instead of the Crimes

29

Code, as has historically occurred. This reading of the Gaming Act would also significantly curtail the Bureau of Liquor Control's enforcement activities with respect to illegal gambling, because many such activities would be entrusted to the Gaming Control Board.

However, there is nothing in the Gaming Act that suggests that it purported to revise all statutes governing illegal gambling, set up a general or exclusive system covering the entire subject matter of gambling, or establish a uniform and mandatory system encompassing all gambling. *See* 1 Pa.C.S. §1971. The Gaming Act does not demonstrate that the General Assembly intended to repeal section 5513 of the Crimes Code, to the extent it continued to regulate illegal gambling. Given the strong presumption against implied repeals of statutes and the lack of an irreconcilable conflict between the Gaming Act's regulation of licensed slot machines and the Crimes Code's regulation of illegal slot machines, we decline to conclude that the Gaming Act impliedly repealed the Crimes Code's regulation of illegal gambling devices and slot machines. Therefore, pursuant to our rules of statutory construction we hold that section 5513 of the Crimes Code, rather than any relevant provision of the Gaming Act, remains the preeminent statute governing illegal and unlicensed slot machines in the Commonwealth.

## V. Conclusion

Because the plain language of the Gaming Act indicates that the General Assembly did not intend for the Gaming Act to regulate unlicensed slot machines which fall outside the ambit of the licensed facilities clearly delineated by the Gaming Act, and/or supplant the Crimes Code's regulation of the same, we conclude that the

POM Game is not subject to the Gaming Act.[18] We therefore deny the Department's application for summary relief in the nature of a motion for a judgment on the pleadings.[19]

_____

PATRICIA A. McCULLOUGH, Judge

Judge Cohn Jubelirer dissents.
Judge Brobson did not participate in this decision.
Judge Covey concurs in the result only.

---

[18] Because we hold that the Gaming Act is inapplicable to the POM Game, we concomitantly conclude that the Department did not fail to join the Gaming Control Board as an indispensable party to the counterclaim, as argued by POM. "A party is generally regarded to be indispensable when his or her rights are so connected with the claims of the litigants that no decree can be made without impairing those rights." *HYK Construction Company, Inc., v. Smithfield Township*, 8 A.3d 1009, 1015 (Pa. Cmwlth. 2010) (internal quotation marks omitted). The relevant analysis of whether a party is indispensable requires consideration of the following factors: (1) whether "absent parties have a right or interest related to the claim"; (2) "[i]f so, what is the nature of that right or interest"; (3) whether that right or interest is "essential to the merits of the issue"; and (4) whether justice can "be afforded without violating the due process rights of absent parties." *Rachel Carson Trails Conservancy, Inc. v. Department of Conservation and Natural Resources*, 201 A.3d 273, 279 (Pa. Cmwlth. 2018). Moreover, regarding cases involving the Commonwealth, "[a] Commonwealth party may be declared an indispensable party when meaningful relief cannot conceivably be afforded without the Commonwealth party's direct involvement in the action." *Id.* at 280.

Here, because the POM Game does not fall under the purview of the Gaming Act, the Gaming Control Board has no regulatory authority regarding the POM Game. Thus, the Gaming Control Board does not have a right or interest related to the counterclaim and meaningful relief can be afforded without its involvement. It is also notable that the Gaming Control Board is aware of this matter, has not sought to intervene, and takes the position that unlicensed "skill games" are not subject to the Gaming Control Board's regulation. *See* Department's Reply Br. at 17; Video, *Pennsylvania House Appropriations Committee Budget Hearing, FY 2019-20*, (February 27, 2019), https://s3.us-east-2.amazonaws.com/pagopvideo/106913203.mp4 (last visited October 15, 2019).

[19] Our denial of the Department's application, however, does not decide the separate question raised in POM's claim, *i.e.*, whether the POM Game is an illegal gambling device under the Crimes Code, which both parties appear to acknowledge requires discovery in order to resolve.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

POM of Pennsylvania, LLC,         :
              Petitioner       :
                                :   No. 418 M.D. 2018
          v.                   :
                                :
Commonwealth of Pennsylvania,   :
Department of Revenue, and City   :
of Philadelphia,                   :
              Respondents     :

## ***ORDER***

AND NOW, this 20th day of November, 2019, the Commonwealth of Pennsylvania, Department of Revenue's (Department) application for summary relief in the nature of a motion for partial judgment on the pleadings, with respect to the Department's counterclaim, is denied.

_____
PATRICIA A. McCULLOUGH, Judge